Patrick M. HENDRICKSON, Plaintiff-Appellant,

v.

GEORGIA POWER CO., Defendant-Appellee.

No. 00-11069.

United States Court of Appeals,

Eleventh Circuit.

Jan. 31, 2001.

Appeal from the United States District Court for the Middle District of Georgia. (No. 96-00500-CV-3-5), Duross Fitzpatrick, Chief Judge.

Before DUBINA and HULL, Circuit Judges, and HODGES*, District Judge.

HULL, Circuit Judge:

Appellant-Plaintiff Patrick Hendrickson appeals the district court's order granting Appellee-Defendant Georgia Power Company's motion for summary judgment on his wrongful death complaint, and denying Hendrickson's motion for partial summary judgment. The principal question on appeal is whether the Georgia Recreational Property Act ("RPA"), O.C.G.A. § 51-3-20, *et seq.,* provides immunity to Georgia Power as the owner of recreational property. After review, we affirm.

## I. FACTUAL BACKGROUND

Appellant-Plaintiff Patrick Hendrickson ("Hendrickson") is the father of a teenage boy murdered at the Dames Ferry Public Use Area ("Dames Ferry"), adjacent to Lake Juliette in Monroe County, Georgia. The teenage boy and a female companion were found dead on the morning of Tuesday, January 3, 1995, on the "point" located on Dames Ferry very close to the water. Both victims had multiple gunshot wounds. Although the body of Hendrickson's son was found in his vehicle, the partially nude body of his son's companion was dragged several feet away from the vehicle. Andrew Cook was arrested and later convicted for both murders.

Dames Ferry is a sixty-five-acre tract fronting on Lake Juliette. Appellee-Defendant Georgia Power Company ("Georgia Power") owns both Dames Ferry and Lake Juliette which supplies water for cooling and steam generation at Georgia Power's Plant Scherer. Georgia Power makes Dames Ferry and Lake Juliette available at no charge to the public for boating, fishing, sailing, swimming, picnicking, camping, hunting,

*Honorable William Terrell Hodges, U.S. District Judge for the Middle District of Florida sitting by designation.

hiking, and scenic viewing of the lake and surrounding area. There are no admission or parking fees at Dames Ferry. There are also no Georgia Power vendors or any other commercial vendors located at Dames Ferry. All recreational features, such as a boat-launching ramp and picnic tables, are provided to visitors at no charge.

Dames Ferry is used extensively by the public from May through early September of each year, when thousands of individuals visit the park. Dames Ferry is used to a much lesser degree in the early spring and fall, and it is used the least during the winter. On weekends from Memorial Day to Labor Day, Georgia Power employs a private security company to monitor the area.

## II. PROCEDURAL HISTORY

Hendrickson brought this wrongful death tort action against Georgia Power to recover damages caused by the death of his son. Hendrickson's complaint alleged that Georgia Power was negligent in that (a) "the unreasonable risk of violent criminal activity to which [his son] was exposed while lawfully on Georgia Power's premises" was reasonably foreseeable and (b) Georgia Power negligently chose "not to take any reasonable measures for the security or protection of persons," such as his son.

At a discovery conference, the district court by consent limited discovery to the applicability of the RPA. After Georgia Power filed a motion for summary judgment, Andrew Cook was convicted for the murder of Hendrickson's son. Hendrickson then filed an excerpt from the criminal trial transcript and in turn Georgia Power proposed to file the entire transcript. The district court then summarily denied Georgia Power's motion for summary judgment and ordered that "[t]he Court will, however, allow Defendant to renew any contention made in its summary judgment motion after further discovery on all liability issues is conducted."

After additional discovery, Hendrickson moved for partial summary judgment arguing that the immunity from liability afforded to property owners under the RPA did not apply to Georgia Power. Georgia Power simultaneously moved for summary judgment as to all liability issues. The district court denied Hendrickson's motion for summary judgment and granted Georgia Power's second motion for summary judgment. *See Hendrickson v. Georgia Power Co.,* 80 F.Supp.2d 1374, 1383 (M.D.Ga.2000). In its order, the court determined: (1) that Georgia Power was entitled to the immunity protections afforded by the RPA; (2) that the RPA's liability exception for willful or malicious failure to warn against a dangerous condition did not apply because the evidence did not create an issue of material fact regarding Georgia Power's knowledge of a dangerous condition at Dames Ferry; and (3) that even if the RPA was not applicable, the murders were not foreseeable crimes, and thus Georgia Power did not have a duty to use reasonable care to

prevent the death of Hendrickson's son. Hendrickson timely appealed.

## III. STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment, applying the same legal standard employed by the district court. *See Whatley v. CNA Ins. Cos.,* 189 F.3d 1310, 1313 (11th Cir.1999). A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether genuine issues of material fact exist, we view all evidence, and make all reasonable inferences, in favor of the party opposing summary judgment. *See Whatley,* 189 F.3d at 1313.

## IV. DISCUSSION

*A.      Georgia's Recreational Property Act*

The State of Georgia enacted the Georgia Recreational Property Act ("RPA"), O.C.G.A. § 51-3-20, *et seq.,* to limit, with narrow exceptions, the liability of a landowner who makes its property available "without charge" to the public for "recreational purposes."[1] O.C.G.A. §§ 51-3-20 to 51-3-25. The statutory purpose of the RPA is "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting the owners' liability toward persons entering thereon for recreational purposes." O.C.G.A. § 51-3-20. Section 51-3-22 of the RPA limits the land owner's duty of care as follows:

> Except as specifically recognized or provided in Code Section 51-3-25, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or give any warning of a dangerous condition, use, structure, or activity on the premises to persons entering for recreational purposes.

O.C.G.A. § 51-3-22.[2] In turn, § 51-3-25 provides that nothing in the RPA, however, limits liability for

---

[1]Subsections 51-3-21(1) and (4) of the RPA define "charge" and "recreational purpose," as follows:

> (1) "Charge" means the admission price or fee asked in return for invitation or permission to enter or go upon the land.
>
> ...
>
> (4) "Recreational purpose" includes, but is not limited to, any of the following or any combination thereof:  hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure diving, nature study, water skiing, winter sports, and viewing or enjoying historical, archeological, scenic, or scientific sites.

O.C.G.A. § 51-3-21(1), (4).

[2]Section 51-3-23 of the RPA also provides that except as provided in § 51-3-25, a landowner:

> who either directly or indirectly invites or permits without charge any person to use the property for recreational purposes does not thereby:

"willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." O.C.G.A. § 51-3-25. The net result is that under the RPA a landowner who makes his property available to the public for recreational use "without charge" is liable only for "willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." O.C.G.A §§ 51-3-20 to 51-3-25.

The Georgia Supreme Court has applied the RPA in a number of decisions that inform our analysis in this case.[3] In *Cedeno v. Lockwood,* 250 Ga. 799, 301 S.E.2d 265 (1983), the Georgia Supreme Court held that Lockwood, the defendant, was not protected by the RPA because the public was permitted on the property for business purposes, even though the business was recreational in nature. *See id.* at 267. The plaintiff was injured on Lockwood's stairway adjacent to a building in Underground Atlanta. The Underground Atlanta property owners, including Lockwood, made "their property available to the public for entertainment purposes and anticipate the visitors will purchase food, merchandise, or services available." *Id.* Finding that the property owners of Underground Atlanta were in the "business of entertainment or recreation," the Georgia Supreme Court held that "[t]he important criterion is the purpose for which the public is permitted on the property." *Id.* The Georgia Supreme Court further held that "[i]f the public is invited to further the business interests of the owner ... the RPA will not shield the owner from liability even though the public receives some recreation as a side benefit." *Id.*

In contrast, in *City of Tybee Island v. Godinho,* 270 Ga. 567, 511 S.E.2d 517 (1999), the Georgia Supreme Court held that the City's sidewalk, adjacent to a public beach, was protected by the RPA even though the City received an indirect financial benefit from the presence of the sidewalk. *See id.* at 519. The Georgia Supreme Court found that:

> a primary purpose of the sidewalk is to "give the public a place of recreation" by providing access to and viewing of a scenic site ... and that the City is not in the business of entertainment or recreation and does not seek to make a profit from the use of the sidewalk.

*Id.* (quoting *Cedeno,* 301 S.E.2d at 267); *see Bourn v. Herring,* 225 Ga. 67, 166 S.E.2d 89 (1969) (holding that a picnic and lake area made available by defendant corporation to the public to promote the sale of

---

(1) Extend any assurance that the premises are safe for any purpose;

(2) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed.

O.C.G.A. § 51-3-23.

[3]As a federal court sitting in diversity, we are required to apply the law as declared by the state's highest court. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

defendant's commercial products and for advertising purposes came within the definition of recreational purpose under the RPA); *Quick v. Stone Mountain Mem'l Ass'n,* 204 Ga.App. 598, 420 S.E.2d 36 (1992) (finding plaintiff's injuries resulted from her general recreational use of park for which no fee was charged and holding park to be a public recreation area protected under the RPA, notwithstanding the fact that substantial revenues were derived from the sale of special permits, concessions, and tickets to rides and other attractions located at the park); *Hogue v. Stone Mountain Mem'l Ass'n,* 183 Ga.App. 378, 358 S.E.2d 852 (1987) (same).

"[I]n situations where commercial interests are mixed with recreational activities," the Georgia Supreme Court recently has adopted a "balancing test" to determine whether the protection of "the RPA may apply." *Anderson v. Atlanta Comm. for Olympic Games, Inc.,* 273 Ga. 113, 537 S.E.2d 345, 348 (2000). The plaintiffs in *Anderson* sued the Atlanta Committee for the Olympic Games ("ACOG"), seeking damages for wrongful death and personal injuries arising from the bombing in Centennial Olympic Park during the 1996 Olympic Games. *See id.* at 347. The ACOG made the land in Centennial Olympic Park available to the public at no charge during the Olympic festivities. *See id.* The *Anderson* plaintiffs argued that the ACOG fell outside the RPA's protection, even though the ACOG charged no fee to the public, because the ACOG's purpose in making Centennial Olympic Park available to public was to further a commercial enterprise. *See id.* at 349.

In *Anderson,* the Georgia Supreme Court held that, for the RPA to apply, "it is not necessary that the public be on the property for 'sheer recreational pleasure' and that the RPA may apply in situations where commercial interests are mixed with recreational activities." *Id.* (quoting *City of Tybee Island,* 511 S.E.2d at 518). Recognizing that Georgia case law gave "little guidance to the courts in determining the applicability of the RPA in mixed-use cases," the Georgia Supreme Court expressly adopted the "balancing test" set forth by the Wisconsin Court of Appeals in *Silingo v. Village of Mukwonago,* 156 Wis.2d 536, 458 N.W.2d 379 (1990) to determine whether property is being used for "recreational" or "commercial" purposes. *Anderson,* 537 S.E.2d at 349. The Georgia Supreme Court adopted this "balancing test":

> [The test] requires that all social and economic aspects of the activity be examined. Relevant considerations on this question include, without limitation, the intrinsic nature of the activity, the type of service or commodity offered to the public, and the activity's purposes and consequence[s].

*Id.* (quoting *Silingo,* 458 N.W.2d at 382). In light of the adoption of this balancing test, the *Anderson* court remanded the case for the trial court "to apply the test." *Id.*

*B.      Dames Ferry*

Applying Georgia law, we find that the district court correctly concluded that Dames Ferry falls under the protection of the RPA. Georgia Power makes Dames Ferry open to the public for recreational activities. The victims were not on the property to further any commercial interests of Georgia Power. There is no mixture of commercial and recreational activities taking place at Dames Ferry. There was no admission fee to get into Dames Ferry, no parking fees, no costs for the use of any of the facilities once a visitor entered Dames Ferry, and there were no vendors in Dames Ferry from whom visitors could buy anything. In fact, the operation of Dames Ferry actually generates expenses for Georgia Power. Furthermore, Dames Ferry is a wholly recreational facility that is used by the public for boating, fishing, sailing, swimming, picnicking, hiking, and scenic viewing of the lake and surrounding area.

We recognize that Hendrickson argues that Georgia Power also operates Dames Ferry for a business or commercial purpose in that it needs water and access to water to generate electricity, and it includes the costs of both the operation and improvement of Dames Ferry in the utility rate bases submitted to the Georgia Public Service Commission ("GPSC") and the Federal Energy Regulatory Commission ("FERC") in order to obtain approval of utility rates charged to consumers.[4] Because Georgia Power includes the operation and improvement costs of Dames Ferry in its utility rate bases, Hendrickson argues that the utility rates passed on to consumers are necessarily higher as a result of the operation of Dames Ferry and that Georgia Power, in a sense, is recouping its costs and to some extent profiting from the operation of Dames Ferry. Hendrickson also emphasizes that Georgia Power's leasing arrangements with the State of Georgia require it to allow public access to its power-generating lake and that Dames Ferry is an access point to that lake. Hendrickson further asserts that Georgia Power also receives intangible benefits in the form of goodwill that Georgia Power can use to its advantage in seeking approvals from regulatory bodies for its utility rates. Therefore, Hendrickson argues that Georgia Power operates Dames Ferry for both recreational and business purposes.

First, Hendrickson's arguments ignore that the purpose of his son's visit to Dames Ferry was recreational and not to further the business of Georgia Power. Georgia Power permits the public on the property only for recreational purposes and not to further its commercial utility business. While Georgia

---

[4]There is evidence in the record to suggest that, at the time of the murders, the operation expenses of Dames Ferry were not included in the utility rate base approved by the GPSC. However, at the summary judgment phase, we must view the evidence in the light most favorable to Hendrickson.

Power makes its property available without charge for recreational purposes, Georgia Power is in the utility business and not in the recreation business. Thus, we reject Hendrickson's contention that this is a mixed-use case.

Secondly, even if Dames Ferry were being used for mixed recreational and business purposes, Dames Ferry is clearly entitled to RPA protection under *Anderson*'s balancing test. For example, the intrinsic nature of Dames Ferry is recreational. The type of service or commodity offered to the public at Dames Ferry is recreational. And, finally, the purpose of the activity at Dames Ferry is recreational.

Furthermore, in *Anderson* the Georgia Supreme Court did not preclude consideration of the factors focused on in *Quick* and *Hogue,* but, rather it emphasized that the balancing test requires that " '*all* social and economic aspects of the activity be examined.' " *Anderson,* 537 S.E.2d at 349 (quoting *Silingo,* 458 N.W.2d at 382) (emphasis supplied). Thus, Georgia law still affords protection under the RPA even where an entity directly generates some revenue from the recreational area and charges for the use of specific attractions such as rides at a public amusement park, so long as a plaintiff's injuries stem from the general recreational use of the property. *See Quick v. Stone Mountain Mem'l Ass'n,* 204 Ga.App. 598, 420 S.E.2d 36, 38 (1992); *Hogue v. Stone Mountain Mem'l Ass'n,* 183 Ga.App. 378, 358 S.E.2d 852, 854 (1987). In both *Quick* and *Hogue,* the Georgia Court of Appeals examined the source of the plaintiffs' injuries and determined that the injuries resulted from the general recreational use of the premises, as opposed to a use for which a fee was charged. *See Hogue,* 358 S.E.2d at 854 (summary judgment granted for defendant under the RPA for injuries sustained by plaintiff while walking to an attraction at Stone Mountain Park); *Quick,* 420 S.E.2d at 37-38 (summary judgment granted for defendant under the RPA for injuries sustained by plaintiff while walking in an unpaved area at Stone Mountain Park). The victims in the present case were not murdered in connection with any commercial activity conducted by Georgia Power or vendors at Dames Ferry for which a fee was charged.[5]

For all of these reasons, Georgia Power's Dames Ferry falls under the RPA, and Georgia Power is immune from liability unless a plaintiff shows a willful or malicious failure to guard or warn of a dangerous, condition, use, structure, or activity.

C.     *Willful or Malicious Conduct Exception*

Hendrickson asserts that Dames Ferry was inherently dangerous in light of criminal activity that took

---

[5]Even without consideration of the factors in *Quick* and *Hogue,* Georgia Power is entitled to RPA protection for the reasons outlined in this opinion.

place prior to his son's murder.  Hendrickson argues that Georgia Power's failure to address this criminal activity amounts to a "willful" or "malicious" failure to guard or warn against a dangerous condition and that Georgia Power thus should not enjoy RPA protection for Dames Ferry.  The district court's order outlined certain criminal activity, such as discharge of firearms, abuse of alcohol, fighting, flashing, burglary, and other assorted conduct.  *See Hendrickson,* 80 F.Supp.2d at 1379.  Hendrickson also introduced several affidavits from witnesses who warned Georgia Power's agents about problems that might occur at Dames Ferry if the status quo continued.  *See id.* at 1379-80.  We agree, however, with the district court's well-reasoned order that the evidence, even when viewed in the light most favorable to Hendrickson, fails to raise a genuine issue of material fact regarding any willful or malicious failure to warn or guard against a dangerous condition or activity by Georgia Power.  These murders were a total aberration and unlike any criminal activities that had ever occurred at Dames Ferry both in type, nature, degree, and time of year.[6] Finally, we also agree with the district court that the crime that occurred in this case was not foreseeable as a matter of law.[7]

---

[6]The criminal activity that did occur at Dames Ferry was in context minor and mostly in the summer months.  For example, in the five years before the murders in 1995, there were two vehicle break-ins in 1991.  There were no vehicle break-ins in 1990.  There was a single stolen vehicle report in June 1993.  Although between May and September Georgia Power averaged twenty thousand visitors per year at Dames Ferry:  (a) only one fight was reported to Georgia Power in 1989;  (b) two fights were reported in 1990, one in 1991, two in 1992;  and (c) there were no fights reported in 1993 or 1994.  None of the reported fights involved guns or knives.  Only the one fight in 1990 involved injuries.  One woman was arrested at Dames Ferry for pointing a gun at another before the murders, but the charges were later no-billed by a Monroe County grand jury.  There was no evidence anyone had ever been shot at Dames Ferry.  This list is not exhaustive, but is illustrative of the type of criminal activity at Dames Ferry.

[7]Hendrickson also argues that the RPA arbitrarily distinguishes between property owners who make their property available without charge and property owners who receive some consideration for allowing the recreational use of the property.  Hendrickson asserts that this distinction violates his equal protection rights under both the United States and Georgia Constitutions because it "furnish[es] a gratuity to a narrow class of property owners."  The Georgia Supreme Court rejected a similar argument in *Anderson. See Anderson,* 537 S.E.2d at 348.  We also find no merit to Hendrickson's argument that the RPA unconstitutionally violated his equal protection rights.  As the Georgia Supreme Court properly noted: "The RPA does not disadvantage a suspect class or interfere with the exercise of a fundamental right and thus it need only bear a reasonable relationship to a legitimate state purpose."  *Id.* at 348 (citing *City of Atlanta v. Watson,* 267 Ga. 185, 475 S.E.2d 896 (1996)).  "Under an equal protection analysis, 'unless the case involves a suspect class or a fundamental right, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest.' "  *Bah v. City of Atlanta,* 103 F.3d 964, 966-67 (11th Cir.1997) (quoting *Panama City Med. Diagnostic, Ltd. v. Williams,* 13 F.3d 1541, 1545 (11th Cir.1994) (citing *Nordlinger v. Hahn,* 505 U.S. 1, 10-11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) and *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439-41, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985))).  We find that the RPA reasonably promotes the legitimate governmental purpose of making recreational property more accessible to the public and that the classification the RPA draws is rationally related to this legitimate purpose.  *See Bah,* 103 F.3d at 966-67;  *see also Anderson,* 537 S.E.2d at 347 (citing *Love v. Whirlpool Corp.,* 264 Ga. 701, 449 S.E.2d 602 (1994)).  Additionally, we disagree that the RPA's distinction between property owners who make their property available to the public without

## V. CONCLUSION

We conclude that the district court properly afforded Georgia Power the protection of the RPA. Accordingly, we affirm the district court's order granting Georgia Power's motion for summary judgment and denying Hendrickson's motion for partial summary judgment.

AFFIRMED.

---

charge is arbitrary or that it violates the United States or Georgia Constitutions for any other reason.